ORAL ARGUMENT NOT YET SCHEDULED
_____

No. 13-5038

**IN THE UNITED STATES COURT OF APPEALS
FOR THE DISTRICT OF COLUMBIA CIRCUIT**
_____

KEVIN HAIRSTON,
                              Plaintiff-Appellant,

v.

DAVITA VANCE-COOKS, Public Printer,
United States Government Printing Office,
                              Defendant-Appellee.
_____

On Appeal from the United States District Court
for the District of Columbia
_____

**OPENING BRIEF OF APPELLANT KEVIN HAIRSTON**
_____

Brian Wolfman, D.C. Bar No. 427491
Anne King, D.C. Bar No. 996578
Institute for Public Representation
Georgetown University Law Center
600 New Jersey Avenue, NW, Suite 312
Washington, DC 20001
(202) 661-6582

Counsel for Appellant

November 1, 2013

## CERTIFICATE AS TO PARTIES, RULINGS, AND RELATED CASES

### I.    Parties and Amici

The parties appearing before the district court and this Court are Plaintiff-Appellant Kevin Hairston and Defendant-Appellee Davita Vance-Cooks, Public Printer, U.S. Government Printing Office (GPO). There are no intervenors or amici.

### II.    Rulings Under Review

Mr. Hairston seeks review of the Order, JA 655, and Memorandum Opinion, JA 656, of the United States District Court for the District of Columbia in *Hairston v. Boarman* (1:08-cv-01531-RWR), both entered on January 16, 2013, granting summary judgment to GPO. Judge Richard W. Roberts issued these rulings.

### III.    Related Cases

This case has not previously been before this Court. Mr. Hairston is unaware of any case that is related to this case under Circuit Rule 28(a)(1)(C).

# TABLE OF CONTENTS

CERTIFICATE AS TO PARTIES, RULINGS, AND RELATED CASES ............. i

TABLE OF CONTENTS ........................................................................ ii

TABLE OF AUTHORITIES ................................................................. v

GLOSSARY ........................................................................................ ix

INTRODUCTION ............................................................................... 1

STATEMENT OF JURISDICTION ..................................................... 3

STATEMENT OF THE ISSUES .......................................................... 3

STATUTES ......................................................................................... 4

STATEMENT OF FACTS AND OF THE CASE ................................. 4

   I.   Background .............................................................................. 5

      A.  GPO's organization .......................................................... 5

      B.  Mr. Hairston's advancement at GPO ................................ 6

   II.  Denial of Promotion to Second Offset Pressperson ................... 8

      A.  GPO Vacancy Announcement 06-476 ............................. 8

      B.  Relisting and denial of promotion for VA 06-554 ........... 11

      C.  Mr. Hairston's successful detail as Second Offset Pressperson ............... 13

   III.  Retaliatory Denial of Training ................................................ 14

   IV.  Post-EEO Complaint Harassment ........................................... 16

   V.  Proceedings and Decision Below ............................................ 18

SUMMARY OF ARGUMENT .............................................................. 20

   I.   Discrimination Claim .............................................................. 20

   II.  Retaliation Claim .................................................................... 22

STANDARD OF REVIEW .....................................................24

ARGUMENT .................................................................24

I.   A Reasonable Jury Could Conclude that GPO's Revocation of
     Mr. Hairston's Promotion was Racial Discrimination. ...................24

  A.   Mr. Hairston has established a prima facie case..........................25

  B.   A reasonable jury could conclude that GPO's rationale for the non-
       promotion is pretext for discrimination. ...............................26

    1.   Mr. Bernazzoli's conflicting testimony about his conversation with
         Mr. Verter and his inconsistent justifications for not promoting
         Mr. Hairston are strong evidence of pretext. .........................28

    2.   In the unlikely event that Mr. Bernazzoli did speak to Mr. Verter, it is
         implausible that Mr. Bernazzoli actually believed Mr. Hairston was
         unqualified.........................................................31

    3.   GPO's reason is also pretext because even if Mr. Hairston had to be
         trained, he would have been able to start working sooner than someone
         from outside GPO. ..................................................37

    4.   Mr. Bernazzoli's patronizing statements about Mr. Hairston and
         GPO's history of discrimination are further evidence of pretext...........40

II.  A Reasonable Jury Could Conclude GPO Retaliated Against Mr. Hairston
     for Activity Protected by Title VII. ..................................44

  A.   Mr. Hairston established a prima facie case. ...........................45

    1.   Mr. Hairston engaged in protected activity by filing EEO complaints
         and this lawsuit....................................................45

    2.   GPO's denial of training was an adverse employment action. ..............46

    3.   The pattern of retaliation and harassment is causally connected to Mr.
         Hairston's protected activity. .......................................50

      a.   GPO took the first opportunity to retaliate. .........................50

b.   GPO's pattern of harassment is further evidence that the denial of training was causally connected to Mr. Hairston's protected activity. ............................................................................52

B.   GPO's proffered rationales for its actions are pretext. .............................54

CONCLUSION ....................................................................................................57

CERTIFICATE OF COMPLIANCE..........................................................................

CERTIFICATE OF SERVICE ..................................................................................

ADDENDUM ..........................................................................................................

# TABLE OF AUTHORITIES

## Cases

\*  *Aka v. Wash. Hosp. Ctr.*, 156 F.3d 1284 (D.C. Cir. 1998) ..................26, 28, 29, 35

*Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242 (1986)...........................................24

*Baloch v. Kempthorne*, 550 F.3d 1191 (D.C. Cir. 2008).........................................46

\*  *Barnabas v. Bd. of Trs. of Univ. of Dist. of Columbia*,
    686 F. Supp. 2d 95 (D.D.C. 2010).......................................................51

*Bell v. Envtl. Prot. Agency,* 232 F.3d 546 (7th Cir. 2000).......................................42

*Bishopp v. District of Columbia*, 788 F.2d 781 (D.C. Cir. 1986)...........................25

\*  *Boone v. Clinton*, 675 F. Supp. 2d 137 (D.D.C. 2009).......................................33, 35

*Brady v. Office of the Sergeant at Arms*, 520 F.3d 490 (D.C. Cir. 2008)...............26

*Burlington N. & Santa Fe Ry. Co. v. White*, 548 U.S. 53 (2006) .....................44, 46

*Carpenter v. Fed. Nat'l Mort. Assoc.*, 165 F.3d 69 (D.C. Cir. 1999).....................27

*Casey v. Mabus*, 878 F. Supp. 2d 175 (D.D.C. 2012) .............................................49

*Colbert v. Tapella*, 649 F.3d 756 (D.C. Cir. 2011)............................................28, 42

*Cones v. Shalala*, 199 F.3d 512 (D.C. Cir. 2000)...................................................25

*EEOC v. Sears Roebuck & Co.*, 243 F.3d 846 (4th Cir. 2001) ...............................30

*Fischbach v. D.C. Dep't of Corr.*, 86 F.3d 1180 (D.C. Cir. 1996).........................31

*Ford v. Gen. Motors. Corp.*, 305 F.3d 545 (6th Cir. 2002) ....................................52

*Freedman v. MCI Telecomms. Corp.*, 255 F.3d 840 (D.C. Cir. 2001)...................46

*Geleta v. Gray*, 645 F.3d 408 (D.C. Cir. 2011) ......................................................30

\* The authorities on which we chiefly rely

*George v. Leavitt*, 407 F.3d 405 (D.C. Cir. 2005) ...................................................27

*Gordon v. New York City Bd. of Educ.*, 232 F.3d 111 (2d Cir. 2000) ....................57

*Grant v. Bethlehem Steel Corp.*, 622 F.2d 43 (2d Cir. 1980) ................................51

*Hamilton v. Geithner*, 666 F.3d 1344 (D.C. Cir. 2012) ....................................51, 54

*Henry v. Wyeth Pharm., Inc.*, 616 F.3d 134 (2d Cir. 2010) ....................................57

*Hicks v. Forest Preserve Dist. of Cook Cty., Ill.*, 677 F.3d 781 (7th Cir. 2012) .....49

*Holbrook v. Reno*, 196 F.3d 255 (D.C. Cir. 1999) ..................................................45

*Holcomb v. Powell*, 433 F.3d 889 (D.C. Cir. 2006) .........................................46, 54

*Jones v. Bernanke*, 557 F.3d 670 (D.C. Cir. 2009) ....................................44, 45, 56

*Loudermilk v. Best Pallet Co., LLC*, 636 F.3d 312 (7th Cir. 2011) ........................54

*Mastro v. Potomac Elec. Power Co.*, 447 F.3d 843 (D.C. Cir. 2006) ....................33

*McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973) ....................................25

*McGrath v. Clinton*, 666 F.3d 1377 (D.C. Cir. 2012) ............................................50

*Mitchell v. Baldrige*, 759 F.2d 80 (D.C. Cir. 1985) ..........................................45, 50

*Mogenhan v. Napolitano*, 613 F.3d 1162 (D.C. Cir. 2010) ..............................46, 48

*Morgan v. Fed. Home Loan Mortg. Corp.*, 328 F.3d 647 (D.C. Cir. 2003) ......44, 45

*Nat'l R.R. Passenger Corp. v. Morgan*, 536 U.S. 101 (2002) ................................53

*Pardo-Kronemann v. Jackson*, 541 F. Supp. 2d 210 (D.D.C. 2008) .......................51

*Porter v. Cal. Dept. of Corrections*, 419 F.3d 885 (9th Cir. 2004) ........................52

*Primas v. Dist. of Columbia*, 719 F.3d 693 (D.C. Cir. 2013) ..................................24

*Sharma v. Dist. of Columbia*, 791 F. Supp. 2d 207 (D.D.C. 2011) ........................52

*Singletary v. Dist. of Columbia*, 351 F.3d 519 (D.C. Cir. 2003) ......................50, 54

*Staub v. Proctor Hosp.*, 131 S. Ct. 1186 (2011) .................................................55, 56

*St. Mary's Honor Ctr. v. Hicks*, 509 U.S. 502 (1993) ............................................26

*Taylor v. Solis*, 571 F.3d 1313 (D.C. Cir. 2009) .........................................50, 53, 54

*Templeton v. First Tenn. Bank, N.A.*, 424 F. App'x 249 (4th Cir. 2011) ...............52

*Texas Dept. of Cmty. Affairs v. Burdine*, 450 U.S. 248 (1981) ........................24, 40

## Statutes

28 U.S.C. § 1291 .......................................................................................................3

28 U.S.C. § 1331 .......................................................................................................3

42 U.S.C. § 2000e-2(d) ...........................................................................................46

42 U.S.C. § 2000e-3(a) ...........................................................................................44

42 U.S.C. § 2000e-5(f)(3) .........................................................................................3

42 U.S.C. § 2000e-16(a) .........................................................................................24

42 U.S.C. § 2000e-16(d) ...........................................................................................3

## Other Authority

*About GPO*, U.S. Government Printing Office, http://www.gpo.gov/about
    (last visited Oct. 31, 2013) ...................................................................................5

U.S. Equal Employment Opportunity Commission, *Annual Report on the Federal
    Workforce: Fiscal Year 2009* (Sept. 30, 2009), available at
    http://www.eeoc.gov/federal/reports/fsp2009/upload/FY-2009-Annual-
    Report.pdf ...........................................................................................................43

U.S. Equal Employment Opportunity Commission, *Annual Report on the Federal Workforce: Fiscal Year 2011* (Sept. 30, 2011), available at http://www.eeoc.gov/federal/reports/fsp2011/upload/FY-2011-Annual-Report-Part-IMaster.pdf ................................................................................................43

**GLOSSARY**

| | |
|---|---|
| EEO | Equal Employment Opportunity |
| GPO | Government Printing Office |
| VA | Vacancy Announcement |

## INTRODUCTION

During his more than twenty years of service at the Government Printing Office (GPO), Kevin Hairston has worked hard to advance his career, rising from police officer to single-color Offset Pressperson. Mr. Hairston received excellent reviews as an apprentice and single-color pressperson, and GPO supervisors repeatedly told him that he was qualified for promotions to multicolor presses—the next step in his career. His advancement at GPO has been stymied, however, because he is African-American, and he has faced retaliation because he sought relief from this discrimination.

In September 2006, Mr. Hairston was denied a promotion to Second Offset Pressperson in GPO's Postal Cards and Passport section because of his race. GPO's Human Capital department deemed Mr. Hairston qualified, and Mr. Hairston's supervisor informed him that he had been selected for the position. Production Manager Jeffrey Bernazzoli revoked his promotion, however, allegedly because he thought Mr. Hairston was unqualified and GPO did not have time to train Mr. Hairston since it needed someone to start immediately. JA 602 [38:15-18]. Mr. Bernazzoli later testified that promoting Mr. Hairston "would have been like throwing, you know, an infant in there," JA 602 [38:8-11], even though Mr. Bernazzoli had not worked on the press floor for over twenty-five years and by his

1

own admission did not know what the position entailed or anything about Mr. Hairston's skills.  JA 591 [17:16-18].

Mr. Bernazzoli asserted that he believed Mr. Hairston was unqualified based on an alleged discussion with his assistant, Marvin Verter. Mr. Verter testified, however, that he did not recall having a conversation with Mr. Bernazzoli, JA 649 [30:12], and that he had no role in Mr. Bernazzoli's decision to revoke Mr. Hairston's promotion because the vacancy "wasn't [his] concern." JA 646 [27:20]. This contradictory testimony suggests that the discussion never occurred and was fabricated to counter Mr. Hairston's discrimination claim.  Moreover, Mr. Bernazzoli knew that hiring someone from outside GPO would take months, but decided to look at external candidates rather than promote Mr. Hairston, despite supposedly needing someone "immediately." JA 602 [38:16-18]. This decision resulted in a lengthy search for an external candidate who, upon hiring, still required additional training. JA 378 [¶ 62].

After Mr. Hairston filed an EEO complaint regarding his non-promotion, GPO initiated a campaign of retaliation and harassment targeted at Mr. Hairston that began with verbal and physical taunting and escalated to denial of training and overtime opportunities. Attempts to end this behavior with subsequent EEO complaints resulted in further harassment by GPO.

The district court ignored almost all of this evidence, including the inexplicable contradictions between Mr. Verter's and Mr. Bernazzoli's testimony and Mr. Bernazzoli's demeaning statements about Mr. Hairston's abilities. The district court also uncritically accepted GPO's assertions that Mr. Hairston was unqualified and that GPO did not have time to train him to operate the press. The record contains evidence that is more than sufficient for a reasonable jury to conclude that GPO's proffered non-discriminatory rationales are pretext and that Mr. Hairston suffered adverse employment actions in retaliation for his EEO activity. For these and other reasons detailed below, the district court's decision should be reversed and the case remanded for trial.

## STATEMENT OF JURISDICTION

The district court had subject-matter jurisdiction under 42 U.S.C. §§ 2000e-5(f)(3), 2000e-16(d), and 28 U.S.C. §1331. JA 41. On January 16, 2013, the district court entered a final order granting summary judgment to GPO, disposing of all claims of all parties. JA 655. On February 4, 2013, Mr. Hairston filed a notice of appeal. R. 53. This Court has jurisdiction under 28 U.S.C. § 1291.

## STATEMENT OF THE ISSUES

1. Whether the district court erred in holding that Mr. Hairston had presented insufficient evidence for a reasonable jury to find that GPO's proffered non-

discriminatory rationales for revoking his promotion to Second Offset Pressperson were pretext and that the true motive was racial discrimination.

2. Whether the district court erred in holding that Mr. Hairston presented insufficient evidence for a reasonable jury to find that GPO retaliated against him for filing EEO complaints and this lawsuit.

## STATUTES

Pertinent statutes are contained in the Addendum.

## STATEMENT OF FACTS AND OF THE CASE

Despite over two decades of hard work at GPO, Mr. Hairston's career advancement was stymied after GPO discriminated against him by revoking his promotion to a position for which he was the only qualified candidate. After Mr. Hairston filed an EEO complaint, GPO retaliated by preventing him from training on new machines and earning deserved overtime pay, and engaged in a pattern of antagonism and harassment.

This section reviews the factual basis for Mr. Hairston's claims. Part I provides background on the organization of GPO's Press Division and Mr. Hairston's GPO career. Part II discusses GPO's discriminatory denial of Mr. Hairston's promotion. Part III explains GPO's retaliatory denial of training opportunities to Mr. Hairston. Part IV describes the retaliatory harassment that Mr.

Hairston has faced since filing his first EEO complaint. Part V discusses the case's procedural history and the decision below.

## I.    Background

### A. GPO's organization

GPO is the federal government's official printer. *See About GPO*, U.S. Government Printing Office, http://www.gpo.gov/about (last visited Oct. 31, 2013). In 2006, GPO's printing unit, the Press Division, consisted of the Web Press, Offset Press, Passport Press, and Letter Press sections. JA 361 [¶ 5]. Printing Plant Workers—the lowest ranking employees on the press floor—and presspersons are supervised by Group Chiefs in each section. JA 360-61 [¶¶ 3, 5]. Group Chiefs are the most senior people with whom the presspersons have regular contact. JA 361 [¶ 5]. Group Chiefs report to an Assistant Foreperson in each section, who in turn reports to the Press Division's Foreperson. JA 361 [¶ 5]. Above the Foreperson in the Press Division are the Assistant Superintendent, the Superintendent, the Production Manager, and, finally, the Director of Plant Operations. JA 361 [¶ 5].

GPO operates both single-color and multicolor presses. JA 368 [¶¶ 24-25]. The number of employees assigned to each type of press varies. JA 368, 371-72 [¶¶ 24, 38]. For example, because multicolor presses have more printing units than single-color presses, more employees are assigned to those presses to perform

tasks such as feeding the paper and filling the ink fountains. JA 371-72 [¶ 38].

Five- and six-color presses have two presspersons, a Head Pressperson and a

Second Pressperson, while a single-color press has only one pressperson. JA 371,

379 [¶¶ 37, 65]. Moving from single-color Pressperson to Second Pressperson on a

multicolor press is a promotion and commands more pay. JA 370 [¶ 32].

### B. Mr. Hairston's advancement at GPO

Kevin Hairston began at GPO in 1987 and has worked hard to advance his

career. He started as a police officer and became a Press Division employee in

1988. JA 520-21 [10:15-20, 11:19-12:7]. In 2001, he scored third out of 134 test-

takers on the Office of Personnel Management's exam for admission to the Offset

Press Assistant Training Program, the first step in becoming a pressperson. JA 523

[13:6-19]; JA 333; JA 362 [¶ 8]. Because of his high score, Mr. Hairston was

invited to participate in the formal apprenticeship program. JA 523 [13:20-25]. He

performed well, consistently earning the highest evaluation ratings of

"Outstanding" and "Excellent." JA 364 [¶ 13]; JA 334-35, 341, 348 (summary of

Hairston performance ratings). He was the first apprentice out of the seven in his

program to operate a press on his own. JA 364 [¶ 14].

During his apprenticeship, Mr. Hairston requested training well beyond what

was required, including significant training in the Second Offset Pressperson

position—the position at issue in this appeal. JA 427 [¶ 6]; JA 365-66 [¶ 18]; JA

532-33 [35:19-36:3]. Mr. Hairston spent six months training on the Passport Section's five- and six-color presses and learned how to perform the tasks required of a Second Offset Pressperson on those presses, including lining up work on the press, removing and cleaning the plates, and re-mounting the plates on the press. JA 532-33 [35:19-36:3]; JA 365-66, 370-71 [¶¶ 18, 34]. Charles Dais—the Head Pressperson on the six-color press and Mr. Hairston's supervisor for much of his training—remarked that Mr. Hairston was "enthusiastic" and a "fast learner" who was "very capable of performing the work of a Second Offset Pressperson" on the six-color press. JA 427-29 [¶¶ 6, 11].

Press Division Superintendent George Domarasky was so confident that Mr. Hairston was sufficiently prepared that he ended Mr. Hairston's apprenticeship six months early. JA 528-29 [21:21-22:8]; JA 434. After Mr. Hairston officially completed his apprenticeship in 2004, GPO elevated him to journeyperson status as a single-color Offset Pressperson on the third (night) shift where he worked for more than two years before applying for the Second Offset Pressperson position at issue in this appeal in 2006. JA 528-29 [21:18-22:21]; JA 66. In addition to his significant earlier experience on multicolor presses as an apprentice, Mr. Hairston successfully worked regular details in the Web Press Section, filling in as a Second Pressperson. JA 554-55 [92:12-21, 93:7-12]; JA 462; JA 379 [¶ 66]; JA 382 [¶ 78].

As explained in the following section, however, GPO has stymied Mr. Hairston's

subsequent attempts at career advancement.

## II.    Denial of Promotion to Second Offset Pressperson

### A. GPO Vacancy Announcement 06-476

In August 2006, Mr. Hairston applied for a new Second Offset Pressperson

position on the multicolor presses in the Passport section, Vacancy Announcement

(VA) 06-476, which was open only to GPO employees. JA 442. GPO's human

resources department, Human Capital, informed Mr. Hairston and his supervisors

that he met the qualifications of the position, JA 104, including the requirement

that the applicant have the "ability to do the work of the position with normal

supervision." JA 442. GPO's records indicate that Mr. Hairston was the only

qualified applicant for the position. JA 70.

On September 5, 2006, Foreperson Earl Hayward selected Mr. Hairston to

fill VA 06-476, and Superintendent George Domarasky approved his selection. JA

70-72; JA 536 [43:7-12], 613-14 [69:21-70:14]. Mr. Hayward informed Mr.

Hairston that he had been selected to fill VA 06-476 but that his promotion would

not be official until Human Capital contacted him. JA 620 [78:4-6]; JA 372 [¶ 42].

After Mr. Hairston had not heard from Human Capital for two weeks, he contacted

Human Capital Specialist Tiffany Robinson, who promised to look into the issue.

JA 537 [44:2-10]; JA 373 [¶43]. Soon after contacting Ms. Robinson, Mr. Hairston

went to Mr. Domarasky to ask about the status of his promotion. JA 373 [¶¶ 44-46]. While Mr. Hairston was in Mr. Domarasky's office, Ms. Robinson called to inform him that his promotion was canceled and that the position had been withdrawn. JA 373 [¶ 44-45]; JA 537-38 [44:20-45:1].

Unbeknownst to Mr. Hairston, Production Manager Jeffrey Bernazzoli (Mr. Domarasky's supervisor) had revoked Mr. Hairston's promotion. JA 445. Mr. Bernazzoli had never supervised Mr. Hairston, did not even know how long Mr. Hairston had been a pressperson, JA 105-07 (Bernazzoli EEO affidavit), and was unable to describe the duties of a Second Offset Pressperson. JA 592 [18:1-6]. Nonetheless, Mr. Bernazzoli claims to have determined that Mr. Hairston was unqualified, later stating that promoting Mr. Hairston up one level to a press on which he had trained extensively as an apprentice "would have been like throwing, you know, an infant in there." JA 602 [38:9-10]; *see also* JA 105 ("[I]t would have been detrimental to Mr. Hairston to put him in this position . . . he would have been up the creek without a paddle.").

Mr. Bernazzoli testified that he revoked Mr. Hairston's promotion because his assistant, Marvin Verter, told him that Mr. Hairston could not do the job, and he was concerned about having to train someone given the time pressure of the passport production schedule. JA 599 [35:19-22], 604 [44:1-22]. Mr. Verter testified, however, that the first time he heard of the vacancy and Mr. Hairston's

9

possible promotion was when he was informed that Mr. Hairston's counsel wanted to depose him in this lawsuit; he did not recall discussing the position with Mr. Bernazzoli or anyone else. JA 648 [29:4-21]. Mr. Verter left the pressroom two years before VA 06-476 was posted and had little interaction with Mr. Hairston thereafter because they worked on different shifts. JA 638-39 [13:21-14:9], 645 [26:16-21].

Mr. Verter denied having any role in Mr. Hairston's selection for VA 06-476 and testified that he would have had no reason to be part of decision-making regarding third-shift pressperson promotions. JA 646-48 [27:20-28:10, 28:19-29:3]. As Mr. Verter emphasized, he was a second-shift manager in the delivery section, so a third-shift pressperson position opening "wasn't [his] concern." JA 646 [27:20]. Moreover, Mr. Bernazzoli only mentioned the alleged conversation with Mr. Verter during his deposition. He never mentioned it during the prior EEO investigation, in which he said only, "it was clear to me that [Mr. Hairston] did not have the experience necessary." JA 105.[1]

---

[1] There is also inconsistent testimony about who brought Mr. Hairston's promotion to Mr. Bernazzoli's attention. Mr. Bernazzoli first testified that Mr. Domarasky brought Hairston's promotion to his attention because he was concerned about Mr. Hairston's ability to do the job. JA 599 [35:6-10]. But Mr. Bernazzoli later testified (in the same deposition) that Mr. Verter was the first one to tell him about Mr. Hairston's possible promotion. Furthermore, Mr. Bernazzoli's claim that Mr. Domarasky told him about the promotion because he felt Mr. Hairston could not do the job is inconsistent with Mr. Domarasky's approval of the promotion. JA 70.

Mr. Hairston went to GPO's EEO Office on September 28, 2006 and complained that the VA 06-476 position had been canceled after his selection because of race discrimination. JA 539 [52:7-17]; JA 438. EEO counselor Teresita Brown told Mr. Hairston that he could not file a discrimination complaint until he had proof that GPO had hired a white person instead of him. JA 539-40 [52:7-17, 53:11-15]; JA 373 [¶ 47]. Accordingly, Ms. Brown told Mr. Hairston to apply for the relisted Second Offset Pressperson position and to come back and file a complaint if he learned that a white person was hired in his place. JA 540 [53:9-15], 543 [68:3-5].

## B. Relisting and denial of promotion for VA 06-554[2]

GPO waited over a month after it revoked Mr. Hairston's promotion to repost the Second Offset Pressperson vacancy as VA 06-554, with the same job description but open to "All U.S. Citizens," including, therefore, applicants who were not GPO employees. JA 407. Mr. Bernazzoli knew that hiring outside candidates could, in his words, be "time consuming," JA 106-07, but the GPO

---

[2] Mr. Hairston's appeal here concerns GPO's discriminatory failure to promote Mr. Hairston to VA 06-476. Had that promotion not been unlawfully revoked, VA 06-554 would not have been posted. This section about VA 06-554 is included, first, because it describes how Mr. Hairston learned that GPO hired Douglas Davis, after which Mr. Hairston filed his EEO complaint, and second, because the timeline of events surrounding the posting and filling of VA 06-554 calls into question Mr. Bernazzoli's claim that he revoked Mr. Hairston's promotion because he needed someone to start work "immediately." JA 602 [38:16-18].

nonetheless opened the position to external candidates despite the passport

production time pressure that Mr. Bernazzoli had earlier cited in rejecting Mr.

Hairston for VA 06-476.

Mr. Hairston applied for VA 06-554, and Human Capital again informed

him that he was qualified. JA 375 [¶¶ 51-52]; JA 150. For the first time since Mr.

Hairston had started working at GPO, the agency held interviews for a Second

Offset Pressperson position. JA 375 [¶ 52]; JA 455; JA 111. Mr. Hairston was told

that he had performed about as well on the interview as the other candidates

interviewed, JA 455-56; JA 376 [¶ 53], but he was informed in January 2007 that

he did not get the promotion. JA 376 [¶ 54]; JA 542 [67:13-19].

As Ms. Brown had instructed, Mr. Hairston investigated who GPO hired for

the position. JA 543 [68:12-24]; JA 376 [¶ 55]. Among other efforts, he asked

people on the press floor if anyone had seen a new employee, and he observed

people coming into work on the first (morning) shift as his work on the third

(night) shift ended to see if there were any new presspersons. JA 543 [68:20-24],

544 [69:5-8]; JA 376 [¶ 55]. On June 14, 2007, Mr. Hairston learned that GPO had

hired Douglas Davis, who is white, for the Second Offset Pressperson position in

late January and that he had started working at GPO in March. JA 376 [¶ 56]; JA

459; JA 152. Despite GPO's asserted urgent need to fill the position, over six

months had passed from when Mr. Hairston's promotion was revoked on

12

September 6, 2006 to when Mr. Davis began working in late March 2007. JA 445;

JA 501. Mr. Hairston went to the EEO office on June 21, 2007 and filed an

informal complaint alleging that GPO's failure to promote Mr. Hairston to the

Second Offset Pressperson positions advertised in VA 06-476 and VA 06-554 was

the result of race discrimination. JA 459. Mr. Hairston followed up with a formal

complaint on August 3, 2007. JA 275.

### C. Mr. Hairston's successful detail as Second Offset Pressperson

Despite being rejected twice for the position of Second Offset Pressperson

purportedly due to his lack of training and qualifications, Mr. Hairston was asked

to fill in for three months in that position. JA 554-55 [92:12-21, 93:2-12]. He

volunteered on the second shift starting in September 2007, JA 462-63, and he was

able to do the job on his own after only three weeks. JA 380 [¶ 67]; JA 250. He

also ran the entire press by himself, filling in when the Head Pressperson took

breaks of up to thirty minutes two or three times per shift. JA 379 [¶ 66]. Multiple

supervisors, including Assistant Superintendent Earl Hayward, Assistant

Foreperson Barry Russell, Group Chief Sidney Zollicoffer, and Foreperson Dio

Enterline commended Mr. Hairston on his excellent work filling in as Second

Offset Pressperson. JA 380 [¶¶ 68, 70]; JA 436. Mr. Russell and Mr. Hayward

recommended Mr. Hairston for a time-off award in recognition of his exemplary

work while on detail. JA 436 (letter stating that Mr. Hairston "displayed a high performance level"); JA 630 [130:2-8, 16-22]; JA 380 [¶ 70].

## III.   Retaliatory Denial of Training

After Mr. Hairston filed his informal and formal EEO complaints regarding the cancellation of his promotion, GPO began retaliating against him. Mr. Hairston regularly indicated his interest in training programs and knew that "[n]ot having the training puts [him] in a disadvantage for promotional opportunities." JA 280 (Hairston EEO affidavit).  On at least three occasions, however, GPO retaliated by denying Mr. Hairston training opportunities. JA 387-91 [¶¶ 97, 99-100, 102-03, 112, 114]; JA 548-49 [86:18-87:1]; JA 280-82.

The first retaliatory denial of training occurred in 2007 when David Eigenbrode, Assistant Foreperson in the Web Press Section, removed Mr. Hairston from training on a web press after less than a week without explanation. JA 578 [123:1-11]; JA 388 [¶ 100].

The next denial of a training opportunity occurred in 2009 after Mr. Hairston filed this lawsuit (on September 3, 2008). JA 9. Mr. Hairston learned on March 30, 2009 that GPO was sending presspersons to train at the Heidelberg press plant in Kennesaw, Georgia. JA 280; JA 295; JA 549 [87:14-19]. Mr. Hairston was never told about this training opportunity and was not invited to go. JA 280. He filed an informal complaint with the EEO Office on April 3, 2009 and followed up with a

14

formal complaint on May 19, 2009, alleging that he was denied the opportunity to train in Georgia due to retaliation and race discrimination. JA 292, 295.

GPO claims that Mr. Hairston was not invited to participate in the training because he did not ask for it, but GPO never provided an opportunity for Mr. Hairston to request training. During the formal GPO EEO investigation into his denial-of-training complaint, Mr. Hairston was told that presspersons had been selected for this training based on their responses to a survey allegedly conducted orally in late 2008 or early 2009. JA 280. GPO claimed that it assigned Douglas Davis, the Craft Training Representative (the same Douglas Davis selected for VA 06-554), to conduct a survey of GPO employees. JA 280, 283; JA 299; JA 465; R. 39-1 at 8 n.6 (GPO motion for summary judgment). Mr. Davis, in turn, allegedly asked Head Web Pressperson Carter Daniel to conduct the survey on the third shift. JA 283; JA 512.

Mr. Hairston denies that Mr. Daniel ever asked him about training and maintains that Mr. Daniel fabricated the written results of the survey to indicate that Mr. Hairston did not want training on any of the two- and four-color presses and that he had already been trained on the Group 98 and Group 86 presses. JA 280; JA 311; JA 559 [100:3-14], 561 [102:7-17]. Mr. Hairston was baffled at seeing these fabricated results for the first time during the EEO investigation. JA 280. Although he had received some training on these types of presses, JA 563

15

[104:2-21], 567 [108:1-11], Mr. Hairston felt that "[t]here is always more to learn." JA 389-90 [¶ 108].

The final retaliatory denial of training occurred in October 2009. JA 576-77 [117:25-118:21]; JA 390 [¶ 110]. Mr. Hairston was asked to indicate on a training form issued by Mr. Davis the areas in which he most wanted training. JA 288; JA 570-71 [111:9-25-112:1-4]. Mr. Hairston followed Mr. Davis's instructions and checked "Request" boxes next to Group Chief, Head Desk Person, and Second Web Offset Pressperson because he needed training in those areas the most, not because he did not want training in other areas. JA 288; JA 390 [¶ 110]. Mr. Hairston never received any of this training but has observed other presspersons being trained and promoted in the areas in which he had requested training. JA 575-77 [116:19-117:3, 118:8-21]; JA 388 [¶ 103], 390-91 [¶¶ 110, 112].

## IV.    Post-EEO Complaint Harassment

In addition to GPO's denial of training, Mr. Hairston has suffered through a pattern of antagonism and harassment since he filed his first EEO complaint on June 21, 2007. JA 469. It began with Mr. Hairston's supervisor, David Eigenbrode, verbally harassing him, embarrassing him in front of his colleagues, humiliating him by intentionally bumping into him, removing him from his press without reason, threatening to mark him down for disciplinary infractions when machine

malfunctions occurred, and ordering him to do other employees' work as those employees looked on. JA 469; JA 383 [¶¶ 81-83].

Mr. Eigenbrode's harassment escalated over time. On June 3, 2008, Mr. Hairston had work to do on his press, but Mr. Eigenbrode moved him from his press to another section that needed a pressperson and replaced him with another pressperson, contrary to GPO practice. JA 583 [142:11-23]; JA 383 [¶ 84]. When Mr. Hairston asked why he was being removed from his press, Group Chief Alan Nadelberg told him that Mr. Eigenbrode made the removal decision. JA 583-84 [142:21-143:4]; JA 383 [¶ 84].

On September 30, 2008, less than one month after Mr. Hairston filed this lawsuit, he was improperly denied an overtime opportunity. JA 469. Mr. Hairston was working on his press in the Web Press Section with Head Web Pressperson Fletcher Ruffin and Second Web Offset Pressperson DeMond King. JA 469. Contrary to accepted GPO practice, Mr. Eigenbrode gave another pressperson an overtime assignment on Mr. Hairston's press rather than Mr. Hairston. JA 469; JA 384 [¶ 86]; JA 472. Press Division Superintendent Barry McMahon later awarded Mr. Hairston three hours of compensatory time to make up for the lost overtime, recognizing that Mr. Hairston should have been offered the overtime opportunity before the other pressperson. JA 483, 485.

The harassment continued after Mr. Hairston filed a formal EEO complaint regarding the denial of overtime on January 2, 2009. JA 385 [¶¶ 89-92]; JA 488. Less than one month later, again contrary to GPO practice, Mr. Eigenbrode demanded that Mr. Hairston provide documentation when he requested the use of one of his sick days. JA 385 [¶ 92]. Typically, a pressperson is required to provide documentation to justify a sick day only if he or she is subject to leave restrictions—Mr. Hairston was not. JA 516 [¶ 3].

In March 2009, Mr. Hairston was again singled out in violation of GPO practice when he was given Printing Plant Worker duty after he was injured. JA 386 [¶ 93]; JA 489, 498. The supervisor of the section where Mr. Hairston had been assigned to Printing Plant Worker duty, Robert Schwenk, said that he had never before seen a pressperson assigned Printing Plant Worker work as light-duty work. JA 386 [¶ 93]; JA 498. Assistant Superintendent Mr. Hayward recognized that Mr. Hairston was being wrongly singled out and reassigned the other injured pressperson to do Printing Plant Worker duty with Mr. Hairston the next day. JA 498. Around this time, Mr. Hairston also learned that he had been denied the Heidelberg training opportunity in Georgia discussed above.

## V.    Proceedings and Decision Below

On September 3, 2008, Mr. Hairston filed this Title VII suit, alleging discrimination and retaliation by GPO. JA 9. On October 1, 2009, the district court

denied GPO's motion to dismiss the discriminatory failure-to-promote claim, but dismissed the retaliation claim for failure to exhaust administrative remedies.[3] JA 18. On May 13, 2010, the district court granted Mr. Hairston leave to file his First Amended Complaint, which added discrimination and retaliation claims regarding the denial of training opportunities. JA 40.

On March 22, 2011, GPO filed a motion for summary judgment, which the district court granted on January 16, 2013. JA 655. The district court concluded that Mr. Hairston did not rebut all of GPO's proffered non-discriminatory reasons for revoking his promotion and denying him training opportunities, JA 656, and credited GPO's explanations for its conduct on both of Mr. Hairston's claims.

Accepting GPO's version of the facts as true, the court held that GPO's reason for revoking Mr. Hairston's promotion was not pretext because "the concurring official and Hairston's former supervisor said that Hairston was not sufficiently trained." JA 665. But the district court did not address inconsistencies in the record, citing the conversation between Mr. Bernazzoli and Mr. Verter without addressing Mr. Verter's testimony that he did not recall having the conversation, JA 648 [29:4-21], and Mr. Bernazzoli's own conflicting testimony regarding who he spoke to about the position. JA 599 [35:5-6]. The district court also failed to address evidence in the record that contradicted Mr. Bernazzoli's

---

[3] Mr. Hairston is not appealing the dismissal of his first retaliation claim.

claim that GPO needed to hire someone immediately, including that GPO took more than six months to fill the position after denying Mr. Hairston the promotion.

The district court also granted summary judgment to GPO on Mr. Hairston's retaliation claim, holding that Mr. Hairston had not proved that the denial of training was an adverse employment action. JA 668. The court did not, however, discuss the importance of training in career advancement at GPO or the pattern of antagonism and harassment suffered by Mr. Hairston.[4]

## SUMMARY OF ARGUMENT

### I.   Discrimination Claim

GPO discriminated against Mr. Hairston because of his race when Production Manager Jeffrey Bernazzoli revoked Mr. Hairston's promotion to the Second Offset Pressperson position. In granting summary judgment to GPO, the district court failed to consider key evidence and decided genuine issues of material fact that should have gone before a jury.

Mr. Hairston satisfies all elements of a prima facie case: he is African-American; he applied for an open position and was deemed qualified for the position by his supervisors and the Human Capital department; and he was denied the promotion while GPO continued to seek other applicants for the position. GPO

---

[4] Although Mr. Hairston is pursuing his retaliation claim in this appeal, *see infra* at 43-57, he is not appealing the grant of summary judgment on his discriminatory denial-of-training claim.

claims that its decision was based on Mr. Bernazzoli's belief that Mr. Hairston was not qualified and would have required extensive training that would have taken too long. The district court accepted GPO's version of events and ignored important facts that would allow a reasonable jury to conclude that this reason is pretext.

First, there is conflicting testimony as to whether Mr. Bernazzoli ever consulted Mr. Verter, a conversation on which GPO rests its claim that Mr. Bernazzoli thought Mr. Hairston was unqualified. Second, even if Mr. Bernazzoli had consulted with Mr. Verter, it is still implausible that he believed Mr. Hairston could not do the Second Offset Pressperson job. Both Mr. Bernazzoli and Mr. Verter had very little knowledge of Mr. Hairston's skills and the requirements of the position. Those who knew Mr. Hairston's work well, such as Mr. Hayward and Mr. Dais, had only positive comments about Mr. Hairston's ability to do the job. Mr. Bernazzoli could have consulted both of them, but did not. Mr. Hayward and Mr. Domarasky both recommended Mr. Hairston for the promotion, and Human Capital determined that he could do the work of the position with minimal supervision.

In addition, Mr. Hairston had trained on the six-color press and had filled in on other similar presses, and had a demonstrated history of hard work and of exceeding expectations. He also later filled in for two months on the same type of press for which Mr. Bernazzoli deemed him unqualified. For these reasons, a jury

21

could find that Mr. Bernazzoli did not actually believe that Mr. Hairston lacked the experience necessary to be a Second Offset Pressperson and instead discriminated against him because of his race.

Moreover, a reasonable jury could have rejected as pretext Mr. Bernazzoli's claimed belief that there was insufficient time to train Mr. Hairston. Mr. Bernazzoli knew that hiring an external candidate would be "time consuming," JA 106-107, and it ended up taking a full extra six months to hire and train Mr. Davis instead of Mr. Hairston.

Finally, a jury could reasonably conclude that Mr. Bernazzoli's real motivation was discrimination because he made several demeaning statements about Mr. Hairston's abilities, including comparing him to an infant. When combined with the history of racial discrimination at GPO, these comments raise serious questions about Mr. Bernazzoli's true motives.

## II.     Retaliation Claim

A reasonable jury could also conclude that GPO retaliated against Mr. Hairston for filing EEO complaints and this lawsuit. The GPO proffered non-retaliatory rationales that Mr. Hairston alleges are pretext and that should have been the focus of the district court. In any event, Mr. Hairston has established a prima facie case because GPO took adverse employment actions that were causally connected to Mr. Hairston's filing of EEO complaints and this lawsuit, activities

protected by Title VII. GPO's retaliation included denial of training, denial of overtime opportunities, and subjecting Mr. Hairston to an overall pattern of antagonism and harassment. Denying Mr. Hairston training is a particularly damaging form of retaliation because of the machine-specific nature of GPO pressroom jobs, a fact that the district court did not address. Mr. Hairston's career at GPO demonstrates that training is an important factor in being eligible for promotion opportunities on different machines. These actions were causally connected to his protected activity because GPO took the first opportunity to retaliate, and the overall pattern of harassment and antagonism would support a jury finding that GPO retaliated against Mr. Hairston because of his protected activity.

Moreover, a reasonable jury could conclude that GPO's proffered non-retaliatory rationales for denying Mr. Hairston the training opportunity are pretext. GPO argues that Mr. Hairston was not interested in the training and that GPO management had no role in the decision. The only document on which GPO relies to argue that Mr. Hairston was not interested in the training is a written summary of an alleged oral survey that Mr. Hairston testified did not occur. In addition, the GPO employees who denied Mr. Hairston training were acting as GPO's agents, so their conduct can be imputed to GPO.

23

## STANDARD OF REVIEW

This Court reviews a district court's grant of summary judgment *de novo*, viewing the record in the light most favorable to the non-movant and drawing all reasonable inferences in his favor. *Primas v. Dist. of Columbia*, 719 F.3d 693, 696 (D.C. Cir. 2013). A grant of summary judgment should be reversed if there are any disputed material facts. *See id.* at 696–97; *see also Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247–48 (1986) (Summary judgment is improper if "a reasonable jury could return a verdict for the non-moving party.").

## ARGUMENT

### I.    A Reasonable Jury Could Conclude that GPO's Revocation of Mr. Hairston's Promotion was Racial Discrimination.

Title VII protects all federal employees from discrimination based on race, color, religion, sex, and national origin. 42 U.S.C. § 2000e-16(a). Under the *McDonnell Douglas* burden-shifting framework, the plaintiff must first establish a prima facie case, creating "a presumption that the employer unlawfully discriminated against the employee." *Texas Dept. of Cmty. Affairs v. Burdine*, 450 U.S. 248, 254 (1981). Then, the burden shifts to the employer to proffer a legitimate non-discriminatory rationale that explains its adverse employment decision. Finally, the burden shifts back to the plaintiff to show that the proffered non-discriminatory rationale is pretext for the true motive: discrimination.

*McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802-04 (1973). Under that framework, Mr. Hairston's case should have gone to the jury.

### A. Mr. Hairston has established a prima facie case.

A plaintiff establishes the prima facie part of a discriminatory failure-to-promote claim by demonstrating that "(1) he is a member of a protected class; (2) he applied for and was qualified for an available position; (3) despite his qualifications he was rejected; and (4) either someone not of his protected class filled the position or the position remained vacant and the employer continued to seek applicants." *Cones v. Shalala*, 199 F.3d 512, 516 (D.C. Cir. 2000). Mr. Hairston satisfies all four elements.

First, Mr. Hairston is African-American, JA 279, and therefore a member of a protected class. *See Bishopp v. District of Columbia*, 788 F.2d 781, 786 (D.C. Cir. 1986) (citing *McDonnell Douglas*, 411 U.S. at 802).

Second, Mr. Hairston applied for and was qualified for VA 06-476, the third-shift Second Offset Pressperson position. JA 405; JA 442-44. After receiving Mr. Hairston's application for VA 06-476, GPO's Human Capital department determined that Mr. Hairston was qualified. JA 444. Then, Foreperson Earl Hayward selected him for the position, and Superintendent George Domarasky approved his selection. JA 444; JA 536; JA 613-14.

Third, although Mr. Hayward and Mr. Domarasky informed Mr. Hairston that he had been selected for VA 06-476, JA 372 [¶¶ 42]; JA 620, Production Manager Jeffrey Bernazzoli revoked Mr. Hairston's promotion. JA 445.

Finally, VA 06-476 was removed from the list of job openings and re-posted over a month later as VA 06-554. JA 407-09. The second posting was open to external candidates but was the same as VA 06-476 in all other respects. JA 407-09. Thus, the Second Offset Pressperson position remained open, and GPO continued to accept applications. After diligent efforts to discover who GPO hired, Mr. Hairston learned on June 14, 2007 that it was Douglas Davis, a white male. JA 376 [¶ 56]; JA 152. The record, therefore, establishes Mr. Hairston's prima facie case.

### B. A reasonable jury could conclude that GPO's rationale for the non-promotion is pretext for discrimination.

Once the employer has proffered a legitimate, nondiscriminatory rationale for the plaintiff's non-promotion, the plaintiff must produce "sufficient evidence" showing that a reasonable jury could find that "the employer's asserted non-discriminatory reason was not the actual reason and that the employer intentionally discriminated against the employee on the basis of race . . . ." *Brady v. Office of the Sergeant at Arms*, 520 F.3d 490, 494 (D.C. Cir. 2008). "If the only explanations set forth in the record have been rebutted, the jury is permitted to search for others, and may in appropriate circumstances draw an inference of discrimination." *Aka v. Wash. Hosp. Ctr.*, 156 F.3d 1284, 1290 (D.C. Cir. 1998); *see also St. Mary's*

*Honor Ctr. v. Hicks*, 509 U.S. 502, 511 (1993) ("[R]ejection of the defendant's proffered reasons will permit the trier of fact to infer the ultimate fact of intentional discrimination.") (emphasis omitted). The record permits a reasonable jury to make such an inference.

GPO asserts that Mr. Hairston was not promoted to the Second Offset Pressperson position because Mr. Bernazzoli believed he was not qualified to work with multicolor presses and GPO did not have time to train him because of tight passport production deadlines. JA 662-63. In holding that Mr. Hairston had not produced sufficient evidence for a reasonable jury to find pretext, the district court ignored evidence that should have precluded summary judgment. *See George v. Leavitt*, 407 F.3d 405, 413 (D.C. Cir. 2005) ("Usually, proffering 'evidence from which a jury could find that [the employer's] stated reasons . . . were pretextual . . . will be enough to get a plaintiff's claim to a jury.'") (quoting *Carpenter v. Fed. Nat'l Mortgage Ass'n*, 165 F.3d 69, 72 (D.C. Cir. 1999)).

First, the evidence strongly suggests that Mr. Bernazzoli fabricated his conversation with Mr. Verter about Mr. Hairston's qualifications. Second, even assuming the conversation took place, it is implausible that Mr. Bernazzoli concluded that Mr. Hairston was unqualified by relying solely on that alleged conversation when Mr. Hairston had the training and skills to be a Second Offset Pressperson and his supervisors believed that he was qualified. Third, even

27

assuming (counterfactually) that Mr. Hairston required extensive training, a reasonable jury could find improbable Mr. Bernazzoli's supposed belief that it would be faster to hire and train an external candidate than to promote and train Mr. Hairston. Finally, Mr. Bernazzoli's condescending comments towards Mr. Hairston and the history of discrimination at GPO also indicate that Mr. Hairston's promotion was revoked because of racial discrimination.

### 1. Mr. Bernazzoli's conflicting testimony about his conversation with Mr. Verter and his inconsistent justifications for not promoting Mr. Hairston are strong evidence of pretext.

An employer's lie about the reason for a promotion decision has "considerable evidentiary significance" in proving pretext. *See Colbert v. Tapella*, 649 F.3d 756, 759 (D.C. Cir. 2011) (quoting *Aka*, 156 F.3d at 1292). Yet the district court unequivocally concluded that "Bernazzoli consulted with Marvin Verter" about Mr. Hairston's qualifications even though the contradictory testimony of Mr. Bernazzoli and Mr. Verter suggest that Mr. Bernazzoli fabricated this conversation. *See* JA 604; JA 649 [30:12]. Instead of ignoring conflicting testimony and making its own credibility determination about what happened, the district court should have allowed a jury to decide whether Mr. Bernazzoli was lying.

Mr. Bernazzoli testified that he spoke with Mr. Verter about whether Mr. Hairston was qualified: "I asked Mr. Verter, you know, can Hairston run this

28

press? And he said no." JA 604 [44:21-22]. However, Mr. Verter testified that he did not recall having a conversation with Mr. Bernazzoli about the job opening, JA 649 [30:12], and that he did not recall hearing about Mr. Hairston applying for the Second Offset Pressperson position. JA 648 [29:14-19] (stating that deposition notice in this lawsuit was "the first time I heard anything about it").

Furthermore, Mr. Verter testified that he had no reason to know anything about Mr. Hairston's promotion because he was not involved in the selection process, and he "had nothing to do with the third shift." JA 648 [29:20-21]; *see also* JA 646 [27:20] (stating that the vacancy "wasn't my concern"). From this conflicting evidence, a reasonable jury could conclude that Mr. Bernazzoli lied about consulting Mr. Verter, which, as noted, would be strong evidence of pretext. *See Aka*, 156 F.3d at 1293 ("If the jury can infer that the employer's explanation is not only a mistaken one in terms of the facts, but a lie, that should provide even stronger evidence of discrimination.").

Not only does Mr. Verter's testimony conflict with Mr. Bernazzoli's, Mr. Bernazzoli's testimony itself is inconsistent. He first testified that Mr. Domarasky brought Mr. Hairston's application to his attention, JA 599 [35:5-6], but when asked later in his deposition who first told him that Mr. Hairston had applied for the position, Mr. Bernazzoli answered that it was Mr. Verter. JA 604 [44:5-10]. This inconsistency further calls into question Mr. Bernazzoli's story about

29

speaking to Mr. Verter, as well as his claim that he spoke to Mr. Domarasky about the position. Despite these inconsistent statements, and without any corroborating evidence that Mr. Bernazzoli ever spoke to Mr. Domarasky, the district court concluded that they spoke and that Mr. Domarasky told Mr. Bernazzoli that Mr. Hairston was unqualified. JA 657. A jury should decide whether that conversation occurred, especially because Mr. Domarasky himself had approved Mr. Hairston's promotion in writing, JA 444, making it implausible that he had told Mr. Bernazzoli that Mr. Hairston was unqualified.

Moreover, Mr. Bernazzoli made other inconsistent statements. During the internal EEO investigation into Mr. Hairston's complaints, Mr. Bernazzoli did not mention having spoken to either Mr. Verter or Mr. Domaraksy about whether Mr. Hairston was qualified, instead attributing his decision to his own knowledge about Mr. Hairston's qualifications and other factors. JA 105. A reasonable jury could view this shift in Mr. Bernazzoli's justifications for cancelling Mr. Hairston's promotion as further evidence of pretext. *See Geleta v. Gray*, 645 F.3d 408, 413 (D.C. Cir. 2011) ("shifting and inconsistent justifications are probative of pretext") (citing *EEOC v. Sears Roebuck & Co.*, 243 F.3d 846, 853 (4th Cir. 2001)) (internal quotation marks omitted).

In sum, the district court erred in crediting part of Mr. Bernazzoli's testimony when other parts of his testimony, his earlier EEO affidavit, and Mr.

Verter's testimony flatly contradict it. The district court usurped the fact-finding role of the jury, which reasonably could have found that these conversations were fabricated after the fact to support the pretextual reason given for cancelling Mr. Hairston's promotion.

### 2. In the unlikely event that Mr. Bernazzoli did speak to Mr. Verter, it is implausible that Mr. Bernazzoli actually believed Mr. Hairston was unqualified.

Unreasonably judging an employee's qualifications can be evidence of pretext because "if the employer made an error too obvious to be unintentional, perhaps it had an unlawful motive for doing so." *Fischbach v. D.C. Dep't of Corr.*, 86 F.3d 1180, 1183 (D.C. Cir. 1996). Even assuming that Mr. Bernazzoli did speak with Mr. Verter, by relying on Mr. Verter's alleged comments and not speaking to any of Mr. Hairston's supervisors (who all thought he was qualified), Mr. Bernazzoli made just such an obvious error. Moreover, Mr. Hairston's extensive training and demonstrated skill as a pressperson further indicate that Mr. Bernazzoli's alleged assessment of Mr. Hairston was pretext for the true reason for revoking Mr. Hairston's promotion: discrimination.

First, Mr. Verter's alleged opinion could not plausibly have led Mr. Bernazzoli to believe that Mr. Hairston was unqualified. Mr. Verter testified that he had never directly supervised Mr. Hairston, that he had only observed Mr. Hairston's work as an apprentice more than two years earlier, and that after Mr.

31

Verter switched to a management position in approximately 2004, he was on a

different shift from Mr. Hairston and did not see him "very often." JA 641-42, 645

[26:16-18]. Mr. Verter also stated that he was "not totally" familiar with the skills

required of a Second Offset Pressperson and that Mr. Verter had never worked

with the six-color passport presses that Mr. Hairston would have worked on in the

new position. JA 644 [24:10-15]. Because Mr. Verter had been Mr. Bernazzoli's

Assistant Production Manager for several years, JA 639-40; JA 107, Mr.

Bernazzoli would have known that Mr. Verter had not worked the same shift as Mr.

Hairston for quite some time and that he had never worked on the six-color

passport presses.[5]

   Mr. Bernazzoli, therefore, could not have believed that Mr. Verter frequently

had opportunities to observe Mr. Hairston's work or was knowledgeable about the

requirements of the position. Thus, even crediting Mr. Bernazzoli's highly

questionable testimony that Mr. Verter told him that Mr. Hairston was unqualified,

a jury should decide whether Mr. Verter's assessment of Mr. Hairston plausibly

could have led Mr. Bernazzoli to determine that Mr. Hairston's promotion should

be canceled. This is especially true because the Human Capital department had

already determined that Mr. Hairston "had the ability to do the work of the position

---

[5] These facts also call into question Mr. Bernazzoli's testimony that he
consulted Mr. Verter because he would have had no reason to ask Mr. Verter about
Mr. Hairston's qualifications.

32

with normal supervision," *see* JA 442, 444, and Mr. Hayward, who was far more familiar with Mr. Hairston's work and the position, had originally selected Mr. Hairston for the promotion.  JA 444.

Second, Mr. Bernazzoli's investigation was not a "reasonably objective assessment" of Mr. Hairston's training and skills because he failed to consult with Mr. Hairston's direct supervisors. *See Mastro v. Potomac Elec. Power Co.*, 447 F.3d 843, 857 (D.C. Cir. 2006); *Boone v. Clinton*, 675 F. Supp. 2d 137, 147 (D.D.C. 2009) (stating that "a reasonable inference of bias could easily be drawn" where the employer did not seek out additional knowledge of the plaintiff's skills before deciding not to promote her). Mr. Bernazzoli lacked basic knowledge about Mr. Hairston's experience, for example stating in his EEO affidavit that Mr. Hairston had "just come out of his apprenticeship program" when he applied for the position, JA 106, although in fact he had been working as a pressperson since 2004. JA 526. Despite having little knowledge of Mr. Hairston's training or qualifications, Mr. Bernazzoli did not seek the opinions of any of Mr. Hairston's immediate supervisors. *See* JA 617 [75:17-19] (Hayward deposition) (stating that no one from management asked him about Mr. Hairston).

For example, Mr. Bernazzoli could have spoken with Earl Hayward, Mr. Hairston's direct supervisor, who was familiar with Mr. Hairston's skills and had selected him for the promotion. JA 618; JA 444. Mr. Hayward testified that he

33

believed Mr. Hairston had "adequate skills" to "immediately" work in the Second Pressperson position. JA 614 [70:9], 616 [72:1]. Although Mr. Hayward stated that it would take some time and training for Mr. Hairston to be able to run the press himself, the Second Pressperson is only responsible for assisting the Head Pressperson with running the press, something that Mr. Hayward believed that Mr. Hairston could do right away with the training he had: "He could work as the second man . . . ." JA 614 [70:12].

Similarly, Charles Dais, a head pressperson on the same type of six-color press that Mr. Hairston would work on and Mr. Hairston's supervisor during his apprenticeship, stated that Mr. Hairston was "very capable of performing the work of a second offset pressperson." JA 428 [¶11]. Had Mr. Bernazzoli been interested in learning whether Mr. Hairston was qualified for the job, it would have made sense to ask Mr. Dais, who was familiar with both the requirements of the position and Mr. Hairston's work. Mr. Bernazzoli did not. JA 599 [35:17-22].

Rather than asking Mr. Hairston's supervisors about his ability to be a Second Offset Pressperson, Mr. Bernazzoli claims to have asked only Mr. Verter (who had never directly supervised Mr. Hairston or worked on a six-color press) whether Mr. Hairston could "run this press," JA 604 [21-22], something a second pressperson does not even need to do. A reasonable jury could infer that Mr. Bernazzoli had no desire to seek out accurate information because he already made

34

up his mind about Mr. Hairston's qualifications for another reason: his race. *See Boone*, 675 F. Supp. 2d at 147 ("[A] reasonable inference of bias could easily be drawn from [Defendant's] refusal to leave her opinion about [Plaintiff]," especially when the plaintiff's direct supervisor supported her promotion.).

Finally, Mr. Bernazzoli's supposed belief that Mr. Hairston was unqualified was not only based on incomplete and unreliable information. It was also dead wrong. One way to show pretext is to demonstrate "that the employer's explanation misstates the candidates' qualifications." *Aka*, 156 F.3d at 1295. Mr. Hairston was qualified to be a Second Offset Pressperson on a six-color press because of his significant prior training on that press and his experience as a pressperson on single-color and two-color presses. During his apprenticeship, Mr. Hairston spent approximately six months training on five- and six-color presses in the passport section. JA 526-27 [18:24-19:7]. Mr. Dais, who supervised him on the press, described him as a "fast learner" and stated that he gave Mr. Hairston more advanced tasks than he would normally give an apprentice. JA 427 [¶6]. During this training, Mr. Hairston learned to do many of the tasks that were listed in VA 06-476 as duties of the Second Offset Pressperson. JA 362, 365-66; JA 442. Mr. Hairston also had years of experience as a pressperson running a single-color press, where many of the tasks are the same as on a multi-color press. For example, on his application for the position, Mr. Hairston listed many of the duties of Second

35

Offset Pressperson as duties of his current position. *Compare* JA 78 (application for employment), *with* JA 442 (list of duties in vacancy announcement).

Indeed, Mr. Hairston had filled in as a Second Pressperson on a web press on several occasions, giving him additional experience in a four-unit, single-color press, which is similar to the six-color passport press that he would be working on as a Second Offset Pressperson. JA 547 [83:1-5]. Given this extensive record of training in the duties required of a Second Offset Pressperson and GPO's determination that Mr. Hairston was qualified, a reasonable jury could find it farfetched that Mr. Bernazzoli assessed Mr. Hairston's qualifications and found that Mr. Hairston could not do the Second Offset Pressperson position.

Furthermore, Mr. Hairston demonstrated his qualifications when he successfully performed the duties of a Second Offset Pressperson, volunteering for eight weeks to fill in on a new six-color passport press on the second shift, the exact same position for which Mr. Bernazzoli had deemed him unqualified. JA 462-63. According to his supervisor, he "showed initiative and skill in completing his assignment and displayed a high performance level," and he was nominated for a time-off award for his quality work. JA 436. Thus, Mr. Bernazzoli's supposed fear that Mr. Hairston was unqualified and would require extensive training was unfounded. In sum, a jury easily could find that GPO's belief that Mr. Hairston was a sufficiently "qualified employee," JA 436, to fill in for the Second Offset

36

Pressperson position, but not qualified to be promoted to that position permanently, is strong evidence of pretext.

### 3. GPO's reason is also pretext because even if Mr. Hairston had to be trained, he would have been able to start working sooner than someone from outside GPO.

Mr. Bernazzoli testified that the pressure of the passport production schedule and the lack of time to train a new employee were reasons he revoked Mr. Hairston's promotion. JA 600 [36:18-19] ("[W]e needed to immediately get up to production."), 602 [38:16-18] ("I needed people that could go over there and immediately start working."). The district court credited these reasons, stating that "Bernazzoli sought someone who could immediately operate the equipment," JA 657, but did not consider the relevant contrary evidence. In fact, even if Mr. Hairston had needed several months of training on the equipment, he would have been able to start working before someone hired from outside GPO, and the record strongly suggests Mr. Bernazzoli knew this. Thus, a reasonable jury could view as pretext GPO's claim that it needed to hire someone else to start production immediately.

GPO's actions undermine the claim that it needed to fill the position "immediately." VA 06-476 was posted on August 14, 2006, JA 442, and Mr. Hairston was selected for the position on September 5, 2006. JA 444. The decision to cancel the position happened shortly thereafter, JA 445, but Vacancy

Announcement 06-554, seeking candidates from both inside and outside GPO, was not posted until over a month later, on October 13, 2006, and did not close until November 2, 2006. JA 407. That it took so long to repost the position seeking outside candidates contradicts Mr. Bernazzoli's assertions that GPO was pressed for time. Even assuming it would take Mr. Hairston two months to train in the position of Second Offset Pressperson on the six-color press—more than twice as long as it actually took him when he later filled in, JA 380 [¶67]—he would have been able to do the job before anyone from outside GPO could even interview for the position.

GPO's actions also suggest that Mr. Bernazzoli knew that Mr. Hairston did not require lengthy training. When GPO detailed Mr. Hairston the next year to fill a vacancy for three months as a Second Offset Pressperson, JA 462-63, it must have known that the training for someone with Mr. Hairston's skills and experience would go quickly, or else it would have been irrational to have sent him on such a brief detail. (Again, in fact, it took Mr. Hairston only three weeks to train on the new press. JA 380 [¶ 67].) In contrast, Mr. Bernazzoli was well aware that going outside of GPO to look for other candidates would take time. In his EEO affidavit, he stated that "it is very hard to go outside to hire because we have to go through the Office of Human Capital and the Union, which can be time consuming." JA 106-07. In addition, Mr. Bernazzoli knew that the Second Offset Pressperson

would be primarily printing passports, which are produced exclusively by GPO. *See* JA 105-06; JA 594. Thus, he would have known that even a highly qualified outside candidate would take at least some time to train for the position. *See* JA 429 [¶12] (Charles Dais declaration) ("Virtually anyone who was hired to work in the passport section at GPO, even if they had years of printing press experience, would have to undergo some sort of training before they could start."). Moreover, Mr. Bernazzoli knew that the position required a security clearance, JA 408; JA 598, which Mr. Hairston already had but could take months for an outside candidate to obtain. JA 377 [¶61]. Obtaining a security clearance, moreover, is not guaranteed. JA 377 [¶ 61]. Given that Bernazzoli knew that hiring and training someone from outside would be "time consuming," JA 107, a reasonable jury could conclude that Mr. Bernazzoli's purported concern about the time crunch was pretext for discrimination.

Finally, the actual timeline of subsequent events calls into question Mr. Bernazzoli's claims that GPO did not want to train Mr. Hairston because of the time pressure from the passport production schedule. Mr. Davis, the white man who was eventually hired, was not offered the job until January 17, 2007, JA 152, more than four months after Mr. Hairston could have started working in the Second Offset Pressperson position, and Mr. Davis did not begin working until two months later, on March 19, 2007. JA 501. Thus, over six months passed between

the date when Mr. Bernazzoli revoked Mr. Hairston's promotion and when Mr. Davis started working. This delay was not unusual: Mr. Hayward testified that it usually takes between six and eight months to hire and train someone from outside for a Second Pressperson position, and that is exactly what happened here. JA 622 [80:18]. Because Mr. Hairston was able to do the job of Second Offset Pressperson after being trained for less than one month when he filled in on the six-color press, JA 380 [¶ 67], he could have already been trained and working in the position for at least five of those months.

In sum, Mr. Bernazzoli's claim that he needed someone immediately and that he believed hiring someone from outside would get the presses running sooner is "unworthy of credence," *see Burdine,* 450 U.S. at 256, and could be found by a jury to be pretext for discrimination.

### 4. Mr. Bernazzoli's patronizing statements about Mr. Hairston and GPO's history of discrimination are further evidence of pretext.

As discussed above, the record is replete with evidence that would permit a reasonable jury to conclude that the reasons offered by the GPO for revoking Mr. Hairston's promotion are not credible and are pretext for discrimination. Other evidence also would allow a reasonable jury to find that Mr. Bernazzoli had a discriminatory motive when he revoked Mr. Hairston's promotion.

**a.** A reasonable jury could interpret patronizing statements by Mr. Bernazzoli about Mr. Hairston as evidence of discriminatory bias. Mr. Bernazzoli testified that promoting Mr. Hairston to the Second Offset Pressperson position, a position that he had trained for and later performed well, "would be like throwing, you know, an infant in there." JA 602 [38:9-10]. Mr. Bernazzoli also stated in his EEO affidavit that "it would have been detrimental to Mr. Hairston to put him in this position because he would not have been able to do it . . . he would have been up the creek without a paddle." JA 105. Both statements are an affront to Mr. Hairston's long history of hard work as a pressperson at GPO and, when made in the context of Mr. Hairston's proven ability and clear qualifications for the Second Offset Pressperson position, further call into question the motive behind Mr. Bernazzoli's decision.

When Mr. Bernazzoli revoked the promotion, Mr. Hairston was a forty-two-year-old man who had worked for nearly twenty years to move up within GPO from a police officer to a pressperson, *see* JA 520-29, consistently exceeding expectations while learning the trade. Comparing Mr. Hairston to an infant evokes the offensive stereotypes that African-Americans are less intelligent and less capable and could easily be seen by a reasonable jury as code for discrimination. Mr. Bernazzoli's statement that it would have been "detrimental to Mr. Hairston" to promote him is also paternalistic and condescending and thus raises serious

questions about Mr. Bernazzoli's motives. Mr. Bernazzoli's statement implies that, despite being a mature adult with extensive experience at the GPO on several different presses, Mr. Hairston needed Mr. Bernazzoli's protection because he could not judge for himself when he should seek a promotion, and that it would have been safer for Mr. Hairston to stay put and not try to advance his career.

Even more offensively, Mr. Bernazzoli's statement suggests that Mr. Hairston was so unqualified for being a Second Offset Pressperson that had he been promoted as his supervisors suggested, he would have suffered some sort of physical or emotional harm. As demonstrated by Mr. Hairston's later performance as a Second Offset Pressperson, this assessment also could not have been farther from the truth. Although Mr. Bernazzoli's statements may not constitute direct evidence of discrimination, when made by a white supervisor about an African-American employee under all of the circumstances described above, they would allow a reasonable jury to infer that Mr. Bernazzoli's decision was motivated by discrimination.

**b.** Mr. Bernazzoli's statements are consistent with GPO's long history of failing to promote African-American employees to senior-level positions. This Court has held that statistical evidence demonstrating a workplace "generally inhospitable to minorities," when combined with other evidence of pretext, can help a plaintiff defeat a motion for summary judgment. *Colbert*, 649 F.3d at 760;

42

*see also Bell v. Envtl. Prot. Agency,* 232 F.3d 546, 553 (7th Cir. 2000)

("[E]vidence of systemic disparate treatment is relevant to and probative of the

issue of pretext even when it is insufficient to support a pattern and practice

disparate treatment case.").  Although approximately 54 percent of GPO's

workforce was African-American in 2009, only about 20 percent of senior-level

management positions were held by African Americans.[6] Moreover, racial

discrimination at GPO may be widespread. The agency has the highest rate of EEO

complaints of all federal government agencies, the number one basis for which was

race discrimination.[7] In 2011, 1.31 percent of GPO's workforce complained of

some form of discrimination.[8]

*     *     *

The record is more than sufficient for a reasonable jury to conclude that

racial discrimination was the real reason for revoking Mr. Hairston's promotion.

For the foregoing reasons, assessed individually or collectively, the district court's

---

[6] U.S. Equal Employment Opportunity Commission, *Annual Report on the Federal Workforce: Fiscal Year 2009* II-68 (Sept. 30, 2009), available at http://www.eeoc.gov/federal/reports/fsp2009/upload/FY-2009-Annual-Report.pdf.

[7] U.S. Equal Employment Opportunity Commission, *Annual Report on the Federal Workforce: Fiscal Year 2011* I-6 (Sept. 30, 2011), available at http://www.eeoc.gov/federal/reports/fsp2011/upload/FY-2011-Annual-Report-Part-IMaster.pdf.

[8] *Id.*

grant of summary judgment to GPO on Mr. Hairston's discrimination claim should

be reversed.

## II.    A Reasonable Jury Could Conclude GPO Retaliated Against Mr. Hairston for Activity Protected by Title VII.

In addition to protecting employees from discrimination, Title VII prohibits

employers from retaliating against employees who complain of discrimination. 42

U.S.C. § 2000e-3(a); *Burlington N. & Santa Fe Ry. Co. v. White*, 548 U.S. 53, 61-

63, 68 (2006). Claims of retaliation, like claims of discrimination, are litigated

under the *McDonnell Douglas* framework. After the plaintiff establishes a prima

facie case of retaliation, the burden shifts to the employer to proffer a non-

retaliatory explanation for its actions. *See Morgan v. Fed. Home Loan Mortg.*

*Corp.*, 328 F.3d 647, 650-51 (D.C. Cir. 2003). The burden then shifts back to the

plaintiff to demonstrate that the proffered explanation is pretext and that a

reasonable jury could conclude that the true motivation was retaliation. *See id.*

Because a reasonable jury could find that GPO's proffered non-retaliatory reasons

are pretext, this Court should reverse the district court's grant of summary

judgment to GPO on Mr. Hairston's retaliation claim.

Although we address below the district court's holding that Mr. Hairston

failed to establish a prima facie retaliation claim, this Court has held that once the

employer proffers a legitimate, non-discriminatory rationale explaining the alleged

retaliation, "asking whether [plaintiff] satisfied his prima facie burden is an

44

unnecessary and improper sideshow." *Jones v. Bernanke*, 557 F.3d 670, 678 (D.C. Cir. 2009) (noting that "these principles apply equally to retaliation claims"). Because GPO asserted non-discriminatory rationales in its motion for summary judgment, R. 39 at 22-23, the district court should have proceeded directly to whether GPO's proffered rationales are "unworthy of credence" and thus pretext. *Jones*, 557 F.3d at 678 (internal quotation marks omitted). This Court, therefore, may reverse the grant of summary judgment solely on the ground that the record permits a reasonable jury to conclude that GPO's rationales are pretext.

### A. Mr. Hairston established a prima facie case.

A plaintiff establishes a prima facie case of retaliation by showing that (1) the plaintiff engaged in activity protected by Title VII, (2) the employer took an adverse employment action, and (3) a causal connection exists between the two. *E.g.*, *Morgan*, 328 F.3d at 651 (citing *Mitchell v. Baldrige*, 759 F.2d 80, 86 (D.C. Cir. 1985)). A reasonable jury could find for Mr. Hairston on all three elements.

### 1. Mr. Hairston engaged in protected activity by filing EEO complaints and this lawsuit.

Filing complaints with a federal agency's EEO office that allege discrimination is "statutorily protected activity." *Holbrook v. Reno*, 196 F.3d 255, 263 (D.C. Cir. 1999). Mr. Hairston filed several informal and formal EEO complaints while GPO engaged in a pattern of retaliation and antagonism. Mr. Hairston first filed a formal EEO complaint regarding the racially motivated

45

revocation of his promotion on August 3, 2007. JA 275. He subsequently filed

additional internal claims of discrimination and retaliation. *See supra* at 14-18.

Each of those claims and this lawsuit are protected activity under Title VII. *See*

*Holbrook*, 196 F.3d at 255.

### 2. GPO's denial of training was an adverse employment action.

Employer actions are retaliatory if they are "materially adverse," such that a

reasonable worker would be dissuaded "from making or supporting a charge of

discrimination" in the future. *Mogenhan v. Napolitano*, 613 F.3d 1162, 1166 (D.C.

Cir. 2010) (quoting *Burlington N.*, 548 U.S. at 68). This Court should reverse the

district court and hold that GPO's denial of training to Mr. Hairston was an adverse

employment action sufficient to make out a prima facie case of retaliation.

Title VII's anti-retaliation provision proscribes "a broader sweep of [adverse

employer] actions than those in a pure discrimination claim." *Baloch v.*

*Kempthorne*, 550 F.3d 1191, 1198 n.4 (D.C. Cir. 2008). Thus, "materially adverse"

employment actions are not limited to "hirings, firings, promotions, or other

discrete incidents." *Holcomb v. Powell*, 433 F.3d 889, 902 (D.C. Cir. 2006). This

Court has acknowledged that "a denial of training may rise to the level of an

adverse employment action." *Freedman v. MCI Telecomms. Corp.*, 255 F.3d 840,

845 (D.C. Cir. 2001); *see also* 42 U.S.C. § 2000e-2(d) (prohibiting employer

discrimination regarding "admission to, or employment in, any program

established to provide apprenticeship or other training"); *Holcomb*, 433 F.3d at 902 (noting that an adverse employment action is one that creates "materially adverse consequences affecting . . . future employment opportunities").

Training is important for GPO career advancement in the press division because jobs are tied to specific machines. VA 06-476 involved five- and six-color presses. JA 443. Other GPO presses include the Group 86 and Group 98 (one-color) presses, and two- and four-color presses. JA 311 (listing the available training on types of presses). Accordingly, when GPO's Human Capital department determines whether an employee is qualified for a job opening, it looks to whether he or she has trained on the press used in the job. For example, Human Capital deemed Mr. Hairston qualified for VA 06-476 because he had already trained and worked on the five- and six-color presses used in that job. JA 104; JA 526 [18:7]. Denying an employee training opportunities, therefore, may prevent career advancement.

Mr. Hairston's career illustrates the link between training and career advancement. After a decade of advancement at GPO, Mr. Hairston entered the Offset Press Assistant Training program after scoring third on an admission exam. JA 521-523 [11:19-12:7, 13:6-19]; JA 333; JA 362 [¶ 8]. Mr. Domarasky graduated Mr. Hairston from the training six months early, and GPO promoted Mr. Hairston to single-color Offset Pressperson. JA 528-29 [21:21-22:8]; JA 366 [¶

19]; JA 89; JA 434. The training program, therefore, resulted in Mr. Hairston's promotion from Printing Plant Worker, an entry-level position, to single-color Offset Pressperson.

Mr. Hairston has sought training on different presses to become qualified for a variety of future job openings. JA 387 [¶ 97-99]. Specifically, Mr. Hairston requested training on two- and four-color presses. JA 280. Despite his expressed interest, however, eight other employees were selected for the Heidelberg training in Kennesaw, Georgia instead of Mr. Hairston.[9] JA 284 (Davis EEO affidavit); JA 295; JA 549-550 [87-88], 578 [123:18-24]; JA 390-91 [¶¶ 110-114]. Denying Mr. Hairston that training was an adverse employment action because it prevented him from qualifying for future job opportunities on those machines, an outcome that would dissuade a reasonable worker from filing EEO complaints in the future. *Mogenhan*, 613 F.3d at 1166.

The district court narrowly focused on the fact that no jobs requiring the type of training offered in Georgia were available before Mr. Hairston had another opportunity to indicate his training preferences (the implication being that he could have attended future two- and four-color press training). JA 668. The district court's short-term focus overlooked that training does not immediately cease to be

---

[9] The Heidelberg training was on two- and four-color press machines. JA 563-64 [104:1-105:23]; JA 280. Although Mr. Hairston acknowledged that he had already received some training on the two-color press, he did not remember training on the four-color press. JA 563-64 [104:13-14, 105:4-6].

useful. A formal notation of the training is placed on the employee's record and can be cited by Human Capital as qualifying the employee for future promotions when those opportunities become available. JA 442 ("Your overall background of experience, education *and training* will be evaluated . . . .") (emphasis added). In addition, had Mr. Hairston attended the Georgia training, he could have trained on different presses in future programs to become qualified for even more job opportunities.

The context in which GPO denied Mr. Hairston the Georgia training, therefore, is distinct from cases in which courts have held that training-related complaints were not sufficiently adverse to constitute retaliation. *See, e.g.*, *Casey v. Mabus*, 878 F. Supp. 2d 175, 184 (D.D.C. 2012) ("[T]he plaintiff alleges no facts to demonstrate how these added trainings would have materially affected her employment."). As noted, training is typically a material element in a GPO employee's qualifications for a new position. JA 442.

What happened here would force a reasonable GPO employee like Mr. Hairston to choose between filing an EEO complaint and risking the loss of essential training opportunities, or remaining quiet in the hope of obtaining more training and qualifying for the next open position. Title VII prohibits GPO from forcing Mr. Hairston to make that choice. *See Hicks v. Forest Preserve Dist. of Cook Cty., Ill.*, 677 F.3d 781, 788 (7th Cir. 2012) (forcing an employee to choose

49

between a demotion or facing further disciplinary action including likely termination "could be said to be no choice at all"). The district court erred by holding that a reasonable jury could not conclude that GPO's decision to deny Mr. Hairston the Georgia training opportunity was an adverse employment action.

### 3. The pattern of retaliation and harassment is causally connected to Mr. Hairston's protected activity.

The final element of a prima facie retaliation claim is that the employer retaliated against the employee "because of" protected activity. *McGrath v. Clinton*, 666 F.3d 1377, 1380 (D.C. Cir. 2012) (internal quotation marks omitted). Evidence of temporal proximity "may alone establish" causation, *Singletary v. Dist. of Columbia*, 351 F.3d 519, 525 (D.C. Cir. 2003), if "the adverse personnel action took place shortly after that activity." *Mitchell*, 759 F.2d at 86. Temporal proximity is just one way to establish causality, and an overall pattern of retaliatory incidents may also allow a jury to find retaliation. *See Taylor v. Solis*, 571 F.3d 1313, 1323 (D.C. Cir. 2009). Temporal proximity is present in this case because GPO took the first opportunity to retaliate against Mr. Hairston after he filed this lawsuit by denying him the Heidelberg training program in Georgia. And that was but one incident in an overall pattern of retaliation and harassment that began soon after GPO learned that Mr. Hairston filed his first EEO complaint in 2007.

### a. GPO took the first opportunity to retaliate.

Temporal proximity alone can establish prima facie causation when an

50

adverse employment action occurs "shortly after" protected activity. *Mitchell*, 759

F.2d at 86. This Court has declined, however, to adopt a bright-line rule defining

these terms and instead evaluates "the specific facts of each case to determine

whether inferring causation is appropriate." *Hamilton v. Geithner*, 666 F.3d 1344,

1357-58 (D.C. Cir. 2012). In this case, the denial of training was only a few

months after Mr. Hairston's protected activity; that is, it occurred "shortly after"

based on the length of time alone. Moreover, cases in this circuit have recognized

that temporal proximity can be established through evidence that the "defendant

retaliate[d] at the first opportunity that [was] presented." *Barnabas v. Bd. of Trs. of*

*Univ. of Dist. of Columbia*, 686 F. Supp. 2d 95, 105 (D.D.C. 2010) (quoting

*Pardo-Kronemann v. Jackson*, 541 F. Supp. 2d 210, 218 (D.D.C. 2008)).

In *Barnabas*, a university professor filed an EEOC complaint in January

2006 stating that the university had discriminated against her based on her age. 686

F. Supp. 2d at 105. The university then reduced her course load for the following

semester, which it did not dispute "was the first opportunity for it to reduce her

teaching load following her protected activity." *Id.* Accordingly, the court held that

a reasonable jury could find causation based on temporal proximity despite a gap

of about seven months. *Id.* at 106. Other circuits have also considered whether an

act was the employer's first retaliation opportunity. *See, e.g.*, *Grant v. Bethlehem*

*Steel Corp.*, 622 F.2d 43, 45 (2d Cir. 1980) (eight-month gap was sufficient for

prima facie causation because employer could not have denied plaintiff work until his eight-month project was completed).[10]

Here, in denying Mr. Hairston the training in Georgia, GPO took the first opportunity to retaliate against him after he filed this lawsuit in September 2008. GPO management knew that Mr. Hairston had regularly indicated interest in training to advance his career, but GPO does not continuously offer training opportunities. JA 284 (Davis EEO affidavit) ("I try to do the surveys at least once a year."); JA 387-88 [¶¶ 99-100, 102]. The alleged survey that Mr. Daniel conducted in December 2008 or January 2009 for the Georgia training program was the first opportunity to deny Mr. Hairston training after he filed this lawsuit in September 2008. JA 9. GPO's denial of training, therefore, was temporally proximate to Mr. Hairston's filing of this lawsuit.

### b. GPO's pattern of harassment is further evidence that the denial of training was causally connected to Mr. Hairston's protected activity.

As noted, temporal proximity is only one method for establishing causation. *Sharma v. Dist. of Columbia*, 791 F. Supp. 2d 207, 219 (D.D.C. 2011) ("Several of our district court cases have also established that a number of factors, including but not limited to temporal proximity, are relevant to evaluating causation."). An

---

[10] For other applications of the first-opportunity principle, see *Ford v. Gen. Motors. Corp.*, 305 F.3d 545, 554-55 (6th Cir. 2002), *Porter v. Cal. Dept. of Corrections*, 419 F.3d 885, 895 (9th Cir. 2004), and *Templeton v. First Tenn. Bank, N.A.*, 424 F. App'x 249, 251 (4th Cir. 2011).

employee also can introduce evidence that he suffered retaliation from an ongoing "pattern of antagonism." *See Taylor*, 571 F.3d at 1323. The employee may introduce "prior acts as background evidence in support of a timely claim" of retaliation. *Nat'l R.R. Passenger Corp. v. Morgan*, 536 U.S. 101, 113 (2002). GPO's denial of the Georgia training to Mr. Hairston was not the first act of retaliation, but one incident in a "pattern of antagonism" that could lead a reasonable jury to conclude GPO retaliated against Mr. Hairston through his supervisors.

Soon after Mr. Hairston filed his first EEO complaint on June 21, 2007, his supervisor Mr. Eigenbrode began a pattern of verbally harassing and shaming him in front of his colleagues. JA 383 [¶ 83]; JA 469. For example, Mr. Eigenbrode ridiculed Mr. Hairston for not being promoted, saying, "Heard you got the Second Man job—NOT!" JA 383 [¶ 82]. He also forced Mr. Hairston to do other employees' work while they and Mr. Eigenbrode watched. JA 383 [¶¶ 81-83]. After this initial harassment, Mr. Eigenbrode continued to retaliate against Mr. Hairston, including by denying Mr. Hairston overtime opportunities. JA 469; JA 384 [¶¶ 85-86].

On September 30, 2008, less than one month after Mr. Hairston filed this lawsuit, Mr. Eigenbrode gave other employees overtime assignments on Mr. Hairston's press instead of Mr. Hairston, contrary to accepted GPO practice. JA

384 [¶ 86]. That occurred after another retaliatory incident when, without explanation, Mr. Eigenbrode withdrew Mr. Hairston from an internal training program only a few months after Mr. Hairston had filed an EEO complaint for non-promotion, the first time that Mr. Hairston had been pulled early from a training program. JA 578 [123:1-11]; JA 388 [¶ 100]. This pattern of antagonism and harassment amounts to more than "petty slights," *Taylor*, 571 F.3d at 1323, and constitutes behavior that a reasonable jury could view as retaliation causally connected to protected activity.

In sum, given the evidence here, causation is "a question for the finder of fact rather than the appellate court." *Singletary*, 351 F.3d at 525; *see also Loudermilk v. Best Pallet Co., LLC*, 636 F.3d 312, 315 (7th Cir. 2011) ("A jury, not a judge, should decide whether the inference [of causation] is appropriate."). The record is sufficient to surpass the "'minimal burden imposed at the prima facie stage'" and permits a reasonable jury to find that GPO's adverse employment actions, including the denial of the Georgia training, were causally connected to Mr. Hairston's filing of EEO complaints and this lawsuit. *Hamilton*, 666 F.3d at 1359 (quoting *Holcomb*, 433 F.3d at 903).

### B. GPO's proffered rationales for its actions are pretext.

In the district court, GPO proffered only two related rationales to explain its retaliatory actions. First, it cited the written summary of the alleged oral survey

conducted by Mr. Daniel as evidence that Mr. Hairston was not interested in the Georgia training program. R. 39 at 22 (GPO Motion for Summary Judgment). Second, GPO argued that because Mr. Daniel was solely responsible for the training survey, his actions cannot be imputed to GPO. *Id.* at 22-23. A reasonable jury could conclude that both rationales are pretext.

As to GPO's first proffered rationale, Mr. Hairston consistently has denied that Mr. Daniel ever asked him whether he was interested in the Georgia training program. JA 311; JA 559 [100:3-14], 561 [102:7-17]; JA 388-90 [¶¶ 103, 108-09]. Moreover, Mr. Daniel's written summary of his alleged oral survey of GPO employees is unreliable because entries were altered or erased at least once. *See* JA 311 (showing erasures and alterations); *see also* JA 466 (McMahon EEO affidavit) (admitting that "we are trying to keep better records and have developed a better form for future surveys"). A reasonable jury could view that document as untrustworthy and choose to believe Mr. Hairston over Mr. Daniel, finding that, at least as to Mr. Hairston, the document and alleged survey were fabricated to cover up GPO's retaliation. JA 280.

Second, the record supports the district court's assumption that Mr. Daniel conducted the alleged oral survey at the direction of management, thus making him GPO's agent. JA 668; *see Staub v. Proctor Hosp.*, 131 S. Ct. 1186, 1193 (2011) (holding that if the "ultimate decisionmaker . . . acted as [an] agent[] of the"

employer, the agent's actions can be imputed to the employer for liability).

Superintendent Barry McMahon stated that "we surveyed" the employees and

"union representatives from Local 1C *were utilized* to conduct the survey." JA 465

(McMahon EEO affidavit) (emphasis added). Douglas Davis, the Craft Training

Representative, also stated that Mr. Daniel conducted the survey "at [his] request."

JA 283. The EEO counselor who investigated Mr. Hairston's complaint confirmed

that "Mr. Davis . . . *had been assigned* to coordinate" the training program and

"distributed the surveys to Union Shop Stewards," including Mr. Daniel. JA 299

(emphasis added). This evidence is sufficient to allow a jury to conclude that Mr.

Daniel "acted as [GPO's] agent" GPO, *Staub*, 131 S. Ct. at 1193, and thus that

GPO retaliated against Mr. Hairston through Mr. Daniel.

The record also permits a reasonable jury to conclude that Mr. Daniel

personally knew that Mr. Hairston had filed EEO complaints. Mr. Daniel stated

that he was aware that Mr. Hairston "had trouble with his supervisor" and

"believes people are picking on him." JA 513. A jury could infer Mr. Daniel's

knowledge of Mr. Hairston's protected activity from those statements alone. *See*

*Jones*, 557 F.3d at 679 (holding that plaintiff "need only offer circumstantial

evidence that could reasonably support an inference that" the supervisors knew of

protected activity).

Even if Mr. Daniel were to deny being aware of Mr. Hairston's protected activity—which he has never done—a reasonable jury could conclude that he acted "explicitly . . . upon the orders of [GPO, which had] the requisite knowledge" of Mr. Hairston's protected activity. *Henry v. Wyeth Pharm., Inc.*, 616 F.3d 134, 148 (2d Cir. 2010) (quoting *Gordon v. New York City Bd. of Educ.*, 232 F.3d 111, 117 (2d Cir. 2000)). GPO knew that Mr. Hairston had filed EEO complaints. JA 275. As discussed above, because Mr. Daniel was a GPO agent, a reasonable jury could conclude that GPO directed Mr. Daniel to retaliate. That is sufficient even if Mr. Daniel lacked personal knowledge that Mr. Hairston was filing EEO complaints.

In sum, the record would permit a reasonable jury to conclude that GPO's proffered non-retaliatory rationales for its actions are pretext, and this Court should reverse the district court's grant of summary judgment.

## CONCLUSION

For all of these reasons, this Court should reverse the district court's grant of summary judgment on Mr. Hairston's discrimination and retaliation claims and remand those claims for trial.

Respectfully submitted,

/s/ Brian Wolfman
Brian Wolfman, D.C. Bar No. 427491
Anne King, D.C. Bar No. 996578
Institute for Public Representation
Georgetown University Law Center
600 New Jersey Avenue, N.W., Suite 312

57

Washington, DC 20001
Tel: (202) 661-6582
Fax: (202) 662-9634
Email: wolfmanb@law.georgetown.edu

Counsel for Appellant[*]

---

[*] Counsel gratefully acknowledges the work of Shelby Leighton and Justin Rowinsky, third-year students at Georgetown University Law Center, who played key roles in researching and writing this brief.

## CERTIFICATE OF COMPLIANCE

This brief complies with the type-volume limitation of Fed. R. App. P. 32(a)(7)(B) because this brief contains 13,411 words, excluding the parts of the brief exempted by Fed. R. App. P. 32(a)(7)(B)(iii) and Circuit Rule 32(a)(1). This brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type style requirements of Fed. R. App. P. 32(a)(6) because this brief has been prepared in 14-point Times New Roman, a proportionally spaced typeface.

/s/ Brian Wolfman_____
Brian Wolfman

**CERTIFICATE OF SERVICE**

I certify that the foregoing Opening Brief of Appellant Kevin Hairston was served on November 1, 2013 on appellee Davita Vance-Cooks, Public Printer, United States Government Printing Office, via this Court's Electronic Case Filing system (ECF) to her attorney of record, John G. Interrante, Assistant United States Attorney, U.S. Attorney's Office for the District of Columbia.

/s/ Brian Wolfman
Brian Wolfman

**ADDENDUM**

# STATUTES AND REGULATIONS

## 42 USC § 2000e–2 - Unlawful employment practices

[…]

(d) Training Programs

It shall be an unlawful employment practice for any employer, labor organization, or joint labor-management committee controlling apprenticeship or other training or retraining, including on-the-job training programs to discriminate against any individual because of his race, color, religion, sex, or national origin in admission to, or employment in, any program established to provide apprenticeship or other training.

[…]


## 42 USC § 2000e–3 - Other unlawful employment practices

(a) Discrimination for making charges, testifying, assisting, or participating in enforcement proceedings

It shall be an unlawful employment practice for an employer to discriminate against any of his employees or applicants for employment, for an employment agency, or joint labor-management committee controlling apprenticeship or other training or retraining, including on-the-job training programs, to discriminate against any individual, or for a labor organization to discriminate against any member thereof or applicant for membership, because he has opposed any practice made an unlawful employment practice by this subchapter, or because he has made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing under this subchapter.

[…]

**42 USC § 2000e–16 - Employment by Federal Government**

(a) Discriminatory practices prohibited; employees or applicants for employment subject to coverage

All personnel actions affecting employees or applicants for employment (except with regard to aliens employed outside the limits of the United States) in military departments as defined in section 102 of title 5, in executive agencies as defined in section 105 of title 5 (including employees and applicants for employment who are paid from nonappropriated funds), in the United States Postal Service and the Postal Regulatory Commission, in those units of the Government of the District of Columbia having positions in the competitive service, and in those units of the judicial branch of the Federal Government having positions in the competitive service, in the Smithsonian Institution, and in the Government Printing Office, the Government Accountability Office, and the Library of Congress shall be made free from any discrimination based on race, color, religion, sex, or national origin

[…]

A-2